IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

NANCY I. CLINE, et al.

      Plaintiffs

v.                                          Case No. JFM-03-CV-529

AGAPE HARVESTER CHURCH, INC., et al.

      Defendants

### PLAINTIFFS' ANSWER TO AGAPE HARVESTER CHURCH'S MOTION FOR SUMMARY JUDGMENT

      Now come Plaintiffs, by Leonard A. Orman, P.A., one of their attorneys, in answer to defendant Agape Harvester Church's (Agape)  Motion for Summary Judgment and say that there are genuine disputes of material facts and that said defendant is not entitled to an entry of summary judgment as a matter of law.  In support of this motion, Plaintiffs hereby incorporates the memorandum of law.

                                  Leonard A. Orman, P.A.
                                  Bar Number 00069
                                  26 South Street
                                  Baltimore, Maryland 21202
                                  (410) 962-0400
                                  Attorney for Plaintiffs

### CERTIFICATION OF MAILING OF SERVICE

      I HEREBY CERTIFY that a copy of the Plaintiffs' Answer to defendant Agape's Motion for Partial Judgment, exhibit and accompanying Memorandum in Support of Answer was submitted  to Lawrence E. Ballantine, Esq., 1 West Pennsylvania Avenue , Suite 500, Towson, MD 21204, attorney for Defendant on this 12th day of November, 2003

                            _____S_____
                            Leonard A. Orman, P.A.

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

NANCY I. CLINE, et al.

      Plaintiffs

v.                                       Case No. JFM-03-CV-529

AGAPE HARVESTER CHURCH, INC., et al.

      Defendants

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFF'S ANSWER TO DEFENDANT AGAPE'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, by and through their attorney, respectfully submits this Memorandum in Support of their answer to motion for summary judgment.

## INTRODUCTION

Plaintiffs filed this action seeking to recover damages suffered by them as the result of the impact of defendants motor vehicle striking and killing Glen H. Cline, Jr., deceased (wife and father of Plaintiffs) which occurred when defendant, John James Christy ("Christy") negligently operated Agape's motor vehicle in such a negligent manner that it struck and killed Mr. Cline. At the time of subject incident, Defendant Christy was acting as Agape's agent, servant or employee.

## CHRISTY AND AGAPE

Defendant Christy admits in his deposition that he performed some type of accounting work for Agape, that Agape provided him with the use of the Agape owned vehicle he was driving at the time of the subject collision and that Agape paid for all repairs and maintenance of said vehicle. He also admits that the vehicle developed engine problems and he was told by a member or members of the board of Agape to take the

vehicle to a specific Amoco station for repair.  In accordance with such instruction, Mr. Christy took the vehicle to the Amoco station for the repair.  The subject incident in this case took place immediately after Mr. Christy picked up the vehicle at the Amoco station and was then driving it to his home.  See  selected pages from Mr. Christy's deposition which are attached hereto as exhibit to Plaintiff's Answer to Agape's Motion for Summary Judgment.

## <u>LEGAL STANDARDS APPLICABLE TO THIS MOTION</u>

**<u>Summary Judgment</u>**- Summary judgment is proper only if the evidence shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." <u>Spencer v. Henderson Webvb, Inc.</u> 81 F. Supp.2d, 582, 588 (D. Md. 1999) quoting  F. Rule Civ. P. 56 (c)).  A genuine  issue as to a material fact exists "if the evidence is such that a reasonable fact finder could return a verdict for the non moving party."  <u>Id.</u> At 588-89 The moving party has the initial burden of showing that there is an absence of evidence to support the non moving party's case. <u>Id,</u> at 589.  The non moving party's evidence "is to be believed and all justifiable inferences are to be drawn in the non movant's favor: <u>Id.</u>  "The Court is obligated to take account of the entire setting of the case" aand examine "all papers of record, as well as well as any material prepared for the motion.: <u>Carty v. Carlin</u> 623 F. Supp., 1181, 1187 (D. MD. 1985).

Under Maryland state law, the function of a summary judgment is not to try the case or resolve factual issues but to determine whether there is a dispute of material fact sufficient to provide an issue to be tried. <u>Coffey v. Derby Steel Co.</u>, 291 Md. 241, 434 A.2d 564 (1970) and <u>Symes v. Marks Rentals</u>, 70 Md. App. 235, 520 A.2d 1110 (1987).  A court is not supposed to attempt to decide issues of fact or of credibility but only to determine

whether such issues exist, Berkey v. Della, 287 Md. 302, 413 A2d 170 (1980), Merchant's Manufacturing Co. v. Lubow, 275 Md. 208, 339 A.2d 664 (1975) and Mazur v. Scavone, 37 Md. App. 695, 378 A.2d 1355 (1977). All inferences are to be resolved in favor of the party opposing a motion for summary judgment. In Fowler v. Smith, 240 Md. 240, 213 A.2d 549, (1965), the Maryland Court of Appeals noted as to the extent of the showing necessary to defeat a motion for summary judgment in a negligence case:

"...Maryland has gone almost as far as any other jurisdiction that we know of in holding that meager evidence of negligence is sufficient to carry the case to the jury. The rule has been stated as requiring submission if there be any evidence, however slight, legally sufficient as tending to prove negligence, and the weight and value of such evidence will be left to the jury."

Legal sufficiency was noted by the court to be simply more than a mere scintilla of evidence. That is, legally sufficient evidence must be more than surmise, possibly or conjecture.

Defendant, Agape, argues in its motion that it is entitled to summary judgment because, it asserts. Mr. Christy was not acting as the agent, servant or employee of Agape at the time of the subject incident. Defendant Agape argues that Agape board members merely suggested that Mr. Christy take the vehicle to the Amoco Station for repairs. A review of Mr. Christy's deposition clearly sets out that while Mr. Christy normally selected when and where to take the vehicle for routine maintenance, in this case of engine problems he contacted Agape (which paid for all repairs) and discussed where to take the vehicle for repairs. Not only did Agape discuss the matter with Mr. Christy, board member, Mr. Bowers, called Mr. Christy back and told him to take it to the specific Amoco station. Whether or not Mr. Bowers call and instructions constituted only a suggestion and/or whether or not Mr. Christy was following Agape's instructions, is purely a question for the

jury to determine.

As set out herein, the evidence shows that there are genuine issues as to material facts and that Agape is not entitled to a summary judgment as a matter of law.

## FACTS IN SUPPORT OF PLAINTIFF'S RESPONSE TO MOTION

1. See CHRISTY AND AGAPE above.

2. Defendant Christy was operating the Agape vehicle and returning with the subject vehicle from the Amoco station, as instructed by Agape, at the time of the subject incident..

## AGAPE IS LIABLE TO PLAINTIFFS FOR INJURIES SUSTAINED AS A RESULT OF THE MOTOR VEHICLE COLLISION

1. It is liable because Christy was acting as its agent during the entire time period from the time Christy  took the vehicle to the Amoco station for repairs until the time that he returned from picking up the vehicle at the Amoco station. In determining liability of an employer to third person for actions of its employee. The  test is whether Christy was actually within the scope of his agency in furtherance of Agape's interests.  Agape was interested in having the engine of its vehicle properly repaired at a specific repair shop. Mr. Christy was authorized and instructed by Agape to performance of his duties regarding the repair of the vehicle. LePore v. Gulf Oil Corp, 237 Md. 591, 207 A.2d 451 (1995).

2. Whether the person was acting within the scope of his or her agency is ordinarily a question for the jury. Cox v. Prince George's County, 296 Md. 162, 460 A.2d 1038 (1983); unless only one reasonable inference can be drawn from the undisputed facts. Dhanraj v. Potomac Electric Power Co, , 62 Md. App. 94, 488 A.2d 512 (1985), affd, 305 Md. 623, 506 A.2d 224 (1986).

## CONCLUSION

For the reasons set forth above, Plaintiffs request that defendant Agape's Motion for Summary Judgment be denied.

_____S_____
Leonard A. Orman, P.A.
26 South Street
Baltimore, Maryland 21202
(410) 962-0400
Attorney for Plaintiffs

EXHIBIT TO BE ATTACHED TO PLAINTIFFS' ANSWER TO DEFENDANT AGAPE'S

MOTION FOR SUMMARY JUDGMENT

**SHEET 3 PAGE 9**

1 in the area that run the emergency food
2 programs, like food kitchens and group homes.

3    Q. Okay, so prior to six months ago who

4 was your employer?

5    A. I worked for Shining Tree Children's 6 Home.

7    Q. What did you do there?

8    A. I was program director.

9    Q. Now, the defendant church, Agape, am I

10 pronouncing that right?

11    A. Agape, yes.

12    Q. What was your affiliation with Agape?

13    A. I was an administrator-there.

14    Q. For how long?

15    A. Starting in 1991 through, I don't

16 recall the exact date, but when I took the job

17 at children's home I believe was in 1999.

18    Q. Now, if I recall correctly the date of

19 this accident that's in this issue was April 20 18th, 2000?

21    A. Yes.

9

**PAGE 10**

1    Q. That's correct

2. Yes, That's correct

3    Q. Okay. At that time what affiliation

4 did you have or relationship, if any, with the

5 church?

6    A. I was not employed at the church.

7    Q. Okay. You were driving a vehicle owned

8 by the church, correct?

9    A. Yes.

10    Q. What was the basis of that?

11    A. That vehicle was part of my

12 compensation package when I was at the church.

13 Q. If you could describe that a little bit

14 more for me, part of your compensation package;

15 in other words, in return for services that you

16 performed in 1999 as an administrator a vehicle

17 was provided to you?

18    A. You mean at the time, the ongoing?

19    Q. Say April 18th of 2000?

20    A. I still provided some administrative 21 support as far as

helping out.


Page 11

1. With the Defendant Agape?

2. Right

3 OK

4.But I was not an employee and the only

5. compensation I had was to drive the automobile

6.And the administrative services you

7. would render, say in the relative time frame,

8 April, 2000 what would these entail?

9.I just handled Quick Books generating

10. reports for the Board meeting

11.Quick Books, like Quicken?

12. Right

13.Revenue, expenses ?

14.Right, profit and loss statements

15.OK, were you pretty much the only

16. one who did this?

17.No

18.There were others involved?

19. Yes

20. This vehicle, what was the year, make

21 and model of that?


                    Page 12

1    A. It was a '93,Honda Civic.
2    Q. When was that provided to you?

3    A. 1993.

4    Q. It was provided to you new?

5    A. Yes.

6    Q. Prior to April, approximately 18th of

7 2000 had you been involved in any other motor

8 vehicle accident?

9            MR. BALLANTINE: Objection.

10 You can answer. Going back to when he got his

11 license?

12 THE WITNESS: How far back? I

13 was in like a fender bender when I was sixteen.

14 BY MR. FREEL:

15    Q. Well, how about from the fender bender

16 when you were sixteen forward?

17    A. No, I don't recall any other accidents.

18    Q. To your recollection as you sit here

19 today the only. motor vehicle accidents that you

20 were involved in would be the fender bender when

21 you were sixteen and the one in April of 2000

                    12

SHEET **4 PAGE** 13

1 involving Mrs. Cline?

2    ˉA. Right.

3    Q. You said you were provided with this

4 1993 Honda Civic in 1993?

5    A. Yes.

6    Q. Is that the vehicle you were driving on

7 or about April 18th of 2000?

8    A. Yes.

9    Q. At the time of this accident in

10 question?

11    A. Yes.

12 Q. Is my understanding correct that that

13 vehicle was owned by the Certificate of Title

14 read Agape Harvester Church as the owner of the

15 vehicle?

16    A. That's correct.

17    Q. I'm not asking you to draw a legal

18 conclusion. On the day of the accident, I trust

19 you recall that day, is that a fair statement?

20    A. Well, it's been a couple years, you

21 know. I'd say my best recollection of the

13

- **PAGE 14**

1 accident was given that night. They were taking

2 down the reports and the next day with the

3 insurance company, I would say that's probably

4 the most accurate information that there is.

5    Q. "That night" being statements given to

6 the Maryland State Police?

7    A. Maryland State Police and the next day

8 to, I believe, Courtney Brown of State Farm

9 Insurance.

10    Q. So the next day would have been April

11 19th of 2000?

12    A. Right.

13    Q. Any other statements you recall giving

14 to Courtney Brown after the one the day after?

15    A. I remember speaking to her the day

16 after. I don't recall if we had further

17 conversations the following day. It might have

18 went into two days.

19 Q. So is it a fair statement that your

20 recollection of the events pertaining to this 21 accident

would have been fresher and more

14

Page 16.

1. A. From there my wife picked me up and

2. drove me to the station where the car was.  It

3. had been in for repair

4. And, where was the car for repair

5 I believe that station was Amoco/

6 In what town?

7 In Clear Spring

8 Clear Spring.  How far away is that

9 from Hagerstown?

10 Ten-fifteen minutes tops.

11    Q. Okay, and in what direction from

12 Hagerstown?

13    A. I guess it was west

14    Q. Towards Breezewood?

15    A. It's going up towards Cumberland, I

16. guess.

17    Q. Not towards Baltimore or Washington?

18    A. Right.

19    Q. You would take Interstate from Cold

20 Spring to Hagerstown?

21            MR.BALLANTINE Clear Spring

16

SHEET **5 PAGE 17**

 1 BY MR. FREEL:

 2    Q. Clear Spring, I'm sorry.

 3    A. Yes.

 4    Q. About what time, if you recall, would

 5 you have picked up the Honda from the Amoco

6 Station in Clear Spring?

7    A. Probably took maybe twenty minutes to

8 get there. We were on the far end of

9 Hagerstown; somewhere between 9:20 to 9:30,

10 that's speculation.

11    Q. And, do you remember the nature of the

12 repairs that were performed?

13    A. Yeah, the engine was overheating and so

14 they had to repair a gasket or something.

15 Something that had to do with the engine

16 overheating.

17    Q. Had the car been there all day?

18    A. Yes.

19    Q. So you picked up the car, I assume you

20 paid a bill for the repairs?

21    A. Uh-huh.

17

**PAGE 18**

1    Q. Is that a yes?

2    A. Yes.

3    Q. And, after you paid the bill what did

4 you do?

5    A. My recollection I got in the car with

6 my two children and proceeded home.

7    Q. Which two children were with you?

8    A. Sterling and Stacey.

9    Q. I assume you were driving the car,

10 correct?

11    A. Yes.

12    Q. And, where was Sterling seated?

13    A. In the front passenger seat.

14    Q. Where was Stacey, I'm assuming she was
15 in the rear.

16    A. Yes, I think she was behind Sterling to
17 the best of my recollection.

18    Q. To the best of your recollection rear
19 passenger side?

20    A. Yes.

21    Q. Do you recall whether either or both of

18

**PAGE 19,**

1 them were wearing se

2    A. Yes, they were

3    Q. So if you could describe for me your

4 best recollection of events that transpired from

5 when you picked up the vehicle and you were

6 traveling, what, eastbound on I-70?

7    A. I would think that would be correct

8    Q. Okay.

9 A. Eastbound o 70, traveling eastbound on

10 70, got to near the nterchange of Interstate 81

11 and 70. At that time it was very dark, rainy,

12foggy and visibility was not very good and I'

13 felt an impact on the vehicle and I pulled off

14, to the side of the road since I thought it was

15.save to do so.  At that time, I got out and

16. looked at the vehicle and there was some damage

17. on the right quarter panel

18. Which front rear, I'm sorry

19. Passenger quarter panel on the front

20 corner of the passe ger's side of the car. And,

21 looked at that. I oke with my children, they

19

**PAGE 28**

1 Q. Okay. Afte you pulled over do you

2 recall whether or no you saw vehicles behind

3 you coming in the s e direction of traffic on

4 eastbound 1-70?

5    A. No.

6    Q. Do you recall being passed by any

7 vehicles?

8    A. When I first pulled over my attention

9 was to my. children and then to the vehicle.

10 Cars may have passed by, I don't recall.

11    Q. Do you recall what the speed limit was 12 in that area?

13    A. I think it's sixty or sixty-five.

14    Q. You don't ha e a specific recollection?

15    A. No, I don't.

16    Q. Back on to t e Amoco in Clear Spring.

17 Was there a particula reason you took it to

18 that location?

19    A. It was recowmended by one of the board

20 members of the church

21    Q. Okay. And, ou said you actually paid

28

1

- SHEET **8 PAGE 29**

1 for the repairs?

2    A. The church paid for it.

3     Q. Was that included as part of the

4  compensation relative to the vehicle?

5     A. Yes.

6     Q. I trust that you had had this vehicle

7  serviced at least before this incident, oil

8  changes?

9     A. Yes.

10    Q. And, you would be the one responsible

11  for getting the oil changes?

12    A. Yes.

13    Q. Anybody else ever assume any

14  responsibility relative to the service of the

15  vehicle?

16    A. No.

17    Q. Was this something that was

18  specifically discussed with you by any of the

19  board members or representatives of the board

20  members in terms of what your responsibilities

21  were relative to the vehicle and servicing it

29

**PAGE 30**

1  and so forth?

2     A. Just the initial responsibility where I

3  could use the vehicle for business and personal

4  use and, you know, when it came to the time when

5  it seemed to be a more expensive repair they

6  asked that I inform the board of that and they

7  said they would cover that.

8     Q. Was it understood that it was your

9 responsibility to take the car to and from

10 servicing?

11 A. I mean I did it, because I was the one

12 driving it. It wasn't like an outline written

13 responsibility. I guess I'm not

14 Sure what you're asking.

15 Q. Okay, that's fair. Was there ever a

16 discussion, either at the time or after, that

17 the vehicle was turned over to you in or about

18 1993, relative to who would be responsible for

19 seeing that the car was serviced or if it

20 required service who would take it to and from

21 the service facility?

30

**PAGE 31**

1     A. No.

2     Q. But it is something that you would do

3 from the time the car was delivered to you?

4     A. Yes.

5     Q. Besides rout ne servicing, like oil

6 changes, tune-ups, an thing like that, was there

7 ever any other service or repair that you recall

8 having been done?

9     A. There was an oil leak one time, a

10 gasket or a rubberize that pops and the oil

11 leaked out and that w s repaired.

12     Q. Was that repaired at the same Amoco

13 Station?

14    A. No, that was actually at Rapid Lube

15 where I got the oil changes done.

16    Q. Did you ever assume any service

17 responsibilities your elf; did you ever do any

18 of your own oil changes?

19    A. No.

20    Q. So my understanding is clear, is my

21 understanding correct that with regard to

                              31

                              1

**PAGE 32**
 1. everyday type maintenance and service you chose
2 whereto take it, is that correct? If you

        3 needed an oil change you didn't have to consult

4 or you weren't referred to anyplace by the

5 board, is that a fair statement?

6    A. Yes.

7    Q. With respect to this particular

8 incident where you had damage to the vehicle,

9 body, a member of the board referred you to this

10 Amoco facility?

11MR. BALLANTINE: Objection. I

12 don't think he said t ere was any body damage

13 required to repair at the Amoco Station, it was

14 the engine.

15MR. REEL: I'm sorry, the

16 engine overheat.

17 BY MR. FREEL:

18    Q. The instance that caused you to take

19 the vehicle to the Am <u>co</u> in Clear Spring, that

20 was at the advice or recommendation of a member

21 of the board?

32

**SHEET 12 PAGE 45**

1 the church board when the engine was overheating

2 to take it to the Amoco facility, correct?

3. A. Yes.

4 Q. Was it a suggestion by the board member

5 specific to this particular problem, being

6 overheating, or was it more of a general premise

7 that if it's serious we want you to take it to

8 Amoco; regular routine service you can pick

9 where you take it?

10    A. It's to this particular incident with

11 the engine overheating.

12 Q. Okay. How did you notice that there

13 was a problem with the engine overheating; was

14 it the temperature light?

15    A. The temperature gauge, yes.

16    Q. How long did it last before you

17 actually did something about it?

18    A. I got it looked at probably the next

19 day.

20    Q. Okay.

21    A. I mean it overheated; I parked the

45

**PAGE 46**

1 vehicle and the next day I drove it up there.

2    Q. Who's the board member that you

3 conferred with on this?

4    A. Who was the board member?

5    Q. Yeah. I think a couple conferred, so I

6 don't remember exactly which one I spoke with.

7    Q. So between the time you noticed it

8 overheating and pulled it over and the time you

9 took it to the Amoco you had a conversation

10 with...

11    A. Yeah, by phone, yeah.

12    Q. And, the basis of your calling -- you

13 called them?

14    A. Yes.

15    Q. What was the purpose for you calling

16 them?

17    A. To let them know that the engine was

18 overheating and if they had any input of what to

19 be done.

20    Q. And, was it during that telephone

21 conversation that this person...

**46**


**PAGE 47**

1    A. They actually -no, they called me

2 back and said, "this is what we recommend.

3    Q. "We" being the board of the church?

**4**    **A.** I mean I don't know if

5 they had an official board meeting, it was

6 a phone call and they were members of the board

7 that made the suggestion

8 - Q. They didn't make the suggestion right

9 at the time you first called them?

10 no,

11. they called you back.

12. Yes

13. The same person you spoke to called you

14 back or somebody else?

15. The same person called me back

16. Don't remember who that was?
17. Dick, Dick Bowers
18. Bowers, B-O-W-E-R-S

19. Yes
20. Q.  And, where does Mr. Bowers live?
21. He lives in ---

**PAGE 48**

 1    Q. Just the city, if you know?
 2    A. Hagerstown
 3    Q. Is it call d the Board of Directors, is
 4 that what it is?
 5    A. Yes.
 6    Q. So you talked to them twice on the
 7 telephone?
 8    A. Yes. That's  two years ago.
 9    Q. I understand. I mean as you recall
10 today.
11    A. Yes.
12    Q. During either one of those telephone
13 conversations do you recall discussing
14 specifically the issue of expense, who would pay
15 for it?
16    A. No.
17    Q. But it is our recollection that there
18 was an understanding that the church would be
19 paying for the repairs?
20    A. Yes.
21    Q. That's all I have right now.

SHEET 13 **PAGE 49**

 1          CROSS-EXAMINATION
 2 BY MR. BALLENTINE:
 3    Q. Mr. Christy, the Board of Directors

4 paid for all the repairs on that vehicle, is

5 that correct?

6    A. Yes.

7    Q. So that was part of the deal, "we're

8 going to give you this car and we'll pay for

9 maintenance."

10    A. Correct.

11    Q. You were not required to take it to the

12 Amoco Station, that was just a suggestion?

13    A. Correct.

14 . At the time this accident occurred were

15 you on any business, official or unofficial, for

16 the Agape Church?

17 MR. FREEL: Objection as to

18 form. Go ahead and answer.

19         THE WITNESS: No.

20 BY MR. BALLENTINE:

21 Let me ask it another way. What, if

                49 -

# PAGE 50

1 any, business were you doing for the Agape

2 Church at the time this accident occurred?

3    A. None.

4    Q. That's all I have.